ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

CATECIA GODBEE,                    )
                                   )
          Petitioner,              )
                                   )
     v.                            )     CV 103-181
                                   )     (Formerly CR 100-069)
UNITED STATES OF AMERICA,          )
                                   )
          Respondent.              )

---

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Petitioner Catecia Godbee ("Petitioner") has filed with this Court a motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the Court **REPORTS** and **RECOMMENDS** that Petitioner's § 2255 motion be **DENIED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of the United States of America ("the Government").

### I. BACKGROUND

**A.    Procedural History**

On August 20, 2001, a federal grand jury returned a superceding indictment charging Petitioner and co-Defendant Clifford Todd Davis ("Davis") with one count of conspiracy to possess with intent to distribute more than 100 kilograms of marijuana and one count of possession with intent to distribute less than 50 kilograms of marijuana, all in violation of 21 §§ U.S.C. 841 & 846. Godbee v. United States, CR 100-069, doc. no. 51 (S.D. Ga. Aug. 20, 2001). A jury convicted Petitioner of the conspiracy count but acquitted her of the

possession count.[1]  Id., doc. no. 81 (S.D. Ga. Jan. 23, 2002).  The District Court then

sentenced her to 78 months of imprisonment.  Id., doc. no. 93 (S.D. Ga. Apr. 22, 2002).

Petitioner filed an appeal, challenging the sufficiency of the Government's evidence; the

Eleventh Circuit affirmed.  See United States v. Godbee, No. 02-12341 (11th Cir. June 4,

2003).  Petitioner then timely filed the instant § 2255 motion.

**B.    Petitioner's Arguments**

Petitioner argues that her retained counsel was ineffective because he failed: 1) to

challenge the testimony of Government witness Brian Bell ("Bell"),[2] 2) to challenge the

admission of statements obtained from Petitioner in violation of her rights to counsel and

against self-incrimination, 3) to seek an adjustment at sentencing for Petitioner's minor or

minimal role in the conspiracy, 4) to raise "Rule 59 or 60 issues regarding [Petitioner's]

having been convicted of conspiracy to distribute less than 50 kilograms of marijuana but

having been sentenced on 100 kilograms rather than 50 kilograms," 5) to consult with

Petitioner and pursue an appeal before the Eleventh Circuit "intervened," and 6) to raise

these various issues on direct appeal.  (See doc. no. 1, pp. 4-5, 7).

Having summarized Plaintiff's claims, the Court will briefly recount the facts of

Petitioner's case.

**C.    Facts of the Case**

In the above-described superceding indictment, the Government alleged that

---

[1]Pursuant to a negotiated plea bargain, Davis pled guilty to the conspiracy count of the indictment. See CR 100-069, doc. nos. 73-74 (S.D. Ga. Oct. 25, 2001).

[2]Bell, who was named in the Government's original indictment, pled guilty to attempt to possess with intent to distribute less than 50 kilograms of marijuana. See CR 100-069, doc. nos. 43-44 (S.D. Ga. May 23, 2001).

Petitioner and Davis, her boyfriend (see CR 100-069, doc. no. 107, pp. 252, 256), were part of a drug conspiracy. In statements to an agent of the Federal Bureau of Investigation ("FBI"), Petitioner admitted: 1) attempting to help Davis have a prior felony conviction erased (id. at 208-29), and 2) helping Davis set up drug deals with Tyrone Williams ("Williams"), a police officer who would later be convicted of conspiracy to possess with intent to distribute cocaine (see id. at 207-11; see also United States v. Williams, CR 102-011 (S.D. Ga. Dec. 23, 2002)). In addition, Government witness Bell testified that, during a July 1999 meeting between Bell, Davis, and Petitioner, Petitioner informed Bell and Davis that she knew how to get cocaine from a narcotics officer who could not only supply them, but also let them know if police were "looking at [them] or trying to indict [them]." CR 100-069, doc. no. 107, p. 172.

On August 10, 1999, roughly one month after the meeting between Bell, Davis, and Petitioner, the United Parcel Service ("UPS") informed law enforcement officers that a suspicious package had arrived at their Augusta, Georgia, office. Id. at 51-52. A canine unit inspected the package; the dog alerted. Id. at 53-54. After securing a search warrant, the officers then inspected the contents of the package, discovering approximately 20 pounds of marijuana. Id. The package was addressed to Beanca Sanders ("Sanders"), a woman who was moving out of an apartment near Davis's residence. Id. at 93-94. Officers attempted two controlled deliveries with an undercover agent posing as a UPS delivery person; both attempts failed. Id. at 51. Nevertheless, when Davis called Sanders to tell her about a UPS sticker on the door of her old apartment, Sanders decided to go to her apartment. Id. at 94.

Upon seeing the UPS delivery sticker on her door, Sanders called the carrier and

3

arranged to pick up her package. Id. at 59, 95.  When Sanders picked up the package, law enforcement officers seized her. Id. at 60, 96. Sanders agreed to cooperate with the officers. Following their directions, she telephoned Davis to ask him what to do with the package. Id. at 98. Davis stated that someone was following him and hung up the phone. Id. at 99. Soon thereafter, Petitioner--whom Sanders had never met before--called Sanders on her cell phone. Id.

Upon identifying herself as "Catecia," Petitioner made arrangements to meet Sanders to take care of the package. Id. at 62. Petitioner also asked Sanders to help her clean out Davis's motel room before police could search it. Id. Upon instructions from law enforcement, Sanders told Petitioner she would call back. Id. In the interim, a recorder was set up so that subsequent conversations with Petitioner could be taped. Id. at 64, 105-07. In a second, taped conversation, Petitioner described her involvement with Davis and Williams and reiterated her concerns regarding the package and the contents of Davis's motel room. See id. at 58-60; see also Gov't Ex. 3C. Later, when officers searched the motel room, they discovered ledgers detailing drug transactions and $26,000 in receipts for money orders, traveler's checks, and wire transfers. Gov't Exs. 2A-2F. Having summarized the record, the Court turns to the merits of Petitioner's contentions.

## II. DISCUSSION

### A.    No Need for Evidentiary Hearing

The Court recognizes that in the Eleventh Circuit, the general rule is "that effective assistance claims will not be addressed on direct appeal from a criminal conviction because an evidentiary hearing, available in a section 2255 proceeding, is often required for

development of an adequate record." <u>Vick v. United States</u>, 730 F.2d 707, 708 (11th Cir.

1984). Nonetheless, this general rule does not require the Court to hold an evidentiary

hearing every time an ineffective assistance of counsel claim is raised. <u>Id.</u> Stated another

way:

> Notwithstanding this legislative mandate, it is well settled that a
> petitioner does not establish his right to a hearing by the simple expedient of
> filing a petition. A hearing is not required on patently frivolous claims or
> those which are based upon unsupported generalizations. Nor is a hearing
> required where the petitioner's allegations are affirmatively contradicted by
> the record.

<u>Stephens v. United States</u>, 14 F. Supp.2d 1322, 1334 (N.D. Ga. 1998) (citation omitted); <u>see</u>

<u>also Powell v. United States</u>, No. 03-10389, slip op. at 2-3 (11th Cir. Dec. 2, 2003) (requiring

evidentiary hearing on § 2255 motion unless record "conclusively" shows that petitioner is

entitled to no relief).

As described in detail below, the Court finds that because Petitioner's claims are

affirmatively contradicted by the record, procedurally barred, or otherwise fail as a matter of

law, no evidentiary hearing is necessary in this case.

**B.    Petitioner's Claims Lack Merit.**

    **1.    Procedural Bar**

Petitioner did not advance any of her arguments at sentencing or on appeal.

"Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be

procedurally barred in a § 2255 challenge."[3]  <u>United States v. Montano</u>, 398 F.3d 1276,

1279-80 (11th Cir. 2005)(*per curiam*)(citing <u>Mills v. United States</u>, 36 F.3d 1052, 1055 (11th

---

[3]As discussed herein, ineffective assistance of counsel claims are excepted from the
procedural default rule. <u>See</u> <u>Massaro v. United States</u>, 538 U.S. 500, 509 (2003).

Cir. 1994)). "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." Mills, 36 F.3d at 1055. Furthermore, alleged errors concerning the Sentencing Guidelines are not generally cognizable on collateral attack. Montemoino v. United States, 68 F.3d 416, 417 (11th Cir. 1995) (*per curiam*). "Because a defendant has the right to directly appeal a sentence pursuant to the Sentencing Guidelines, the defendant is precluded from raising Guidelines issues in collateral proceedings under § 2255." Martin v. United States, 81 F.3d 1083, 1084 (11th Cir. 1996).

In other words, Petitioner may not use this collateral attack as "a surrogate for a direct appeal." Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004)(citation omitted). A procedural bar or default cannot be overcome unless the § 2255 movant "can demonstrate a cause for this default and show actual prejudice suffered as a result of the alleged error." Montano, 398 F.3d at 1280. "In the alternative, a defendant can also overcome the procedural bar created by the failure to appeal if he could [sic] show a fundamental miscarriage of justice; 'in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.'" Id. (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).

Similarly, claims that are raised and rejected on direct appeal are generally precluded from reconsideration in a § 2255 motion. United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); Mills, 36 F.3d at 1056; Edwards v. United States, 795 F.2d 958, 961 (11th Cir. 1986); United States v. Rowan, 663 F.2d 1034, 1035 (11th Cir. 1981) (*per curiam*). As the Seventh Circuit noted, "[W]e do not see how a federal prisoner--who must file his motion

6

for relief under 2255 in the very court that convicted him--can be allowed to do so if all he is doing is rehashing a claim that had been rejected on the direct appeal." White v. United States, 371 F.3d 900, 902 (7th Cir. 2004). Nor will the Court reconsider a previously raised claim where it is merely a re-characterization of an issue raised on direct appeal.[4] Nyhuis, 211 F.3d at 1343. Thus, to obtain review in this § 2255 proceeding of a previously raised claim, Petitioner must show an intervening change in law since her appeal was decided and that a "complete miscarriage of justice" would occur if the claim is not considered in these proceedings. Davis v. United States, 417 U.S. 333, 346-47 (1974). As Petitioner makes no such argument, to the extent Petitioner attempts to recast a sufficiency of the evidence argument, the Court declines to revisit the issue because this ground was rejected by the Eleventh Circuit on direct appeal.

### 2.    Ineffective Assistance of Counsel Claims

Of course, to avoid the procedural default rule outlined above, Petitioner couches all of her claims in terms of the alleged ineffective assistance of her attorney. Such claims are excepted from the general procedural default rules explained above. Lynn, 365 F.3d at 1234 n.17 (citing Massaro, 530 U.S. 500 (2003)). However, ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is a difficult standard to meet. Massaro, 538 U.S. at 505. First, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. In applying this test, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional

---

[4]Stated another way, simply putting a new name on an old issue will not suffice.

7

assistance[.]" Id. at 689; see also Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing "that petitioner was not entitled to error-free representation"). Second, Petitioner must establish prejudice by showing "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.

In applying the Strickland components outlined above, "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Smith v. Wainwright, 777 F.2d 609, 616 (11th Cir. 1985). Under the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome . . . ." Id. at 616 (citing Strickland, 466 U.S. at 694-95). For as the Eleventh Circuit has ruled, an affirmative showing of prejudice that would undermine the results of the proceedings is necessary because "'attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding' is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004).

In addition, the Court is guided by the principle that "[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the

8

attorney's decisions." Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001).

Indeed, strategic decisions are entitled to a "heavy measure of deference." Strickland, 466

U.S. at 691. "Given the strong presumption in favor of competence, the petitioner's burden

of persuasion--though the presumption is not insurmountable--is a heavy one." Fugate v.

Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). As the Eleventh Circuit has

succinctly stated, "The test has nothing to do with what the best lawyers would have done.

Nor is the test even what most good lawyers would have done. We ask only whether some

reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel

acted . . . ." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). "[C]ases in

which habeas petitioners can properly prevail on the ground of ineffective assistance of

counsel are few and far between." Id. at 1511.

Because determining whether Petitioner suffered prejudice hinges upon the validity

of the underlying claims, Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990) and

Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988), the Court will review the merits of

the allegations which form the basis of Petitioner's ineffective assistance claims.

### a.    Testimony of Government Witness Bell

First, Plaintiff contends that counsel should have challenged the testimony of

Government witness Bell. Over counsel's unsuccessful objection, Bell testified that

Petitioner "said she knew where to get some cocaine and she wanted to know if we were

interested in purchasing some." CR 100-069, doc. no. 107, p. 171. Bell also explained that

Petitioner stated that Williams could let the conspirators know if the police were "looking

at" them. Id. at 172. Petitioner argues that Bell's testimony "only alluded to incidents that

9

did not move forward of [sic] a random conversation stage and whose allegations were not confirmed by testimony or affidavit by . . . Williams." (Doc. no. 1, p. 7). Here, Petitioner identifies nothing from which to suppose that counsel's performance was deficient in any way.

First, it should be reiterated that counsel's handling of Bell's testimony represented a trial tactic that is entitled to deference. See, e.g., Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1995)(§ 2254 case). On cross-examination, Petitioner's counsel asked Bell about the terms of his plea agreement and his inability to describe Petitioner's house, despite Bell's assertion that he had been there. CR 100-069, doc. no.107, pp. 182-86. During closing argument, counsel pointed out discrepancies between Bell's and Petitioner's testimony. Id. at 353-57. Petitioner offers nothing to support the notion that this course of action was unreasonable.

In addition, Petitioner's argument that Bell's testimony regarding her involvement with Williams was uncorroborated lacks merit. First, Sanders testified that, during her phone conversation with Petitioner, Petitioner stated that she would talk to Williams. Id. at 103. Likewise, Petitioner told FBI Special Agent John Parrish ("SA Parrish") that her sister was dating Williams and acted as an intermediary between herself and Williams. Id. at 207, 210-11. Petitioner also told SA Parrish other details regarding Williams's and Davis's drug dealings. See id. at 207-209. Finally, Petitioner told the FBI that Williams had a unique role in the conspiracy because he could tip off the conspirators if the police were about to take action. Id. at 211. Simply put, Petitioner falls woefully short of showing that counsel's handling of Bell's testimony resulted in any prejudice.

**b.      Petitioner's Statements to SA Parrish**

Petitioner also argues that counsel should have challenged the admission of the statements she made to SA Parrish. SA Parrish interviewed Petitioner on September 16 and 27, 1999.[5] Id. at 206, 214. Petitioner was arrested more than a year later, on December 4, 2000. Id. at 291-92. Petitioner claims her September 1999 statements to SA Parrish were given in violation of her Fifth and Sixth Amendment rights. (Doc. no. 1, pp. 4-5). These arguments fail because Petitioner was not in custody during any of her interviews with SA Parrish.

SA Parrish initially interviewed Petitioner on September 16th as part of his investigation into allegations of corruption in the Richmond County Sheriff's Department. CR 100-069, doc. no. 107, pp. 206, 223, 225. Petitioner came to SA Parrish's office for the interview. Id. at 225-26, 228. Of particular note, the target of the investigation at this point was Williams, not Petitioner. See id. at 206-21, 229-30. SA Parrish spoke to Petitioner again the next day. Id. at 211. Convinced that giving information to investigators was her best hope, Petitioner began passing information to SA Parrish. Id. at 284-85. Specifically, Petitioner returned to SA Parrish's office on September 27th; she also paged him several times to let him know she had helpful information. Id. at 214, 227,  231-32, 236. Throughout this period, SA Parrish confirmed to Petitioner that she was not under arrest. Id. at 222. Indeed, as mentioned *supra*, Petitioner was not arrested until December 2000, more than a year after Petitioner made the September 1999 statements.

---

[5]SA Parrish also attended two other interviews of Petitioner conducted by the Richmond County Sheriff's Department and Drug Enforcement Administration ("DEA") agents. Id. at 205-06. However, no statements allegedly made by Petitioner at these interviews were introduced at trial.

Petitioner's own testimony regarding her interactions with SA Parrish also indicates that the interviews were not custodial interrogations. Petitioner stated that she met with SA Parrish to see "what [she] could do to help [herself] out." Id. at 281. In fact, Petitioner explained that she was "trying to help" the FBI and "work" with them. Id. at 296. Petitioner even went so far as to complain that she "was at the FBI office like [she] worked there." Id. at 289. Furthermore, Petitioner admitted that, following her initial interview with SA Parrish on September 16th, she actually called him on September 17th to arrange their next meeting. Id. at 283. Finally, Petitioner also admitted paging SA Parrish. Id. at 289.

Under Miranda v. Arizona, 384 U.S. 436 (1966), law enforcement officials may not take a person into custody and interrogate her without advising her of her right to remain silent and her right to counsel. However, these rights do not attach every time an officer questions a suspect; rather, Miranda applies to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." Id. at 444. In order for the protections of Miranda to attach, "it must be evident that, under the totality of the circumstances, a reasonable [person] in the suspect's position would feel a restraint on [her] freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that [she] would not feel free to leave." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000).

SA Parrish was not required to administer Miranda warnings just because he spoke to Petitioner; nor did the fact that the interviews occurred in a "coercive environment" such as an FBI office transform them into custodial interrogations. See Oregon v. Mathiason, 429 U.S. 495 (1977)(*per curiam*)("[P]olice officers are not required to administer Miranda

warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). This would be true even if SA Parrish had attempted to mislead Petitioner regarding the Government's evidence against her or her coconspirators. See id. at 495-96 (officer's false statement that suspect's fingerprints were found at the scene irrelevant to determining whether suspect was in custody for Miranda purposes).

Here, there is no evidence of coercion or any restraint upon Petitioner's liberty which could serve as the functional equivalent of custody. Rather, Petitioner was free to come and go as she pleased, and often initiated her interaction with SA Parrish. Simply put, Petitioner has outlined no meritorious argument for the suppression of her statements to SA Parrish, and the Court is aware of none. Petitioner's ineffective assistance of counsel claims fail on this score.

### c.    Role in the Offense

Next, Petitioner argues that counsel should have sought an adjustment for her "minor or minimal role" in the conspiracy under U.S.S.G. § 3B1.2. (Doc. no. 1, p. 4). Assuming this alleged error under the Sentencing Guidelines ("the Guidelines") is cognizable on collateral attack, the claim is meritless. It is true that the Guidelines provide for a four-level downward adjustment if the defendant was a "minimal participant" in the crime, as well as a two-level decrease if the defendant was a "minor participant." U.S.S.G. § 3B1.2 (a), (b). To merit such an adjustment, a defendant's role in the offense must make her "substantially less culpable that the average participant." Id. cmt. n.3(A).

13

Here, Petitioner outlines no facts to support her claim. The Court is never "required to find, based solely on the defendant's bare assertion," that a role adjustment is warranted. Id. cmt. n.3(C). Rather, to merit an adjustment, Petitioner must establish her minimal or minor role by a preponderance of the evidence. See United States v. Ryan, 289 F.3d 1339, 1348 (11th Cir. 2002)(*per curiam*). In sum, Petitioner's conclusory allegation that she was only a minor or minimal participant in the conspiracy lacks merit and need not be discussed at length.

### d. Rule 59 & 60 "Issues"

Petitioner's claim that she was sentenced for conspiracy to possess 100 kilograms of marijuana when the jury only convicted her of conspiring to possess 50 kilograms of marijuana is similarly devoid of merit. First, Petitioner's apparent resort to the Federal Rules of Civil Procedure is unavailing. See, e.g., United States v. Fair, 326 F.3d 1317, 1318 (11th Cir. 2003)(*per curiam*)(Fed. R. Civ. P. 60 no basis for relief in a criminal case). More importantly, the jury convicted Petitioner as to count one of the superceding indictment, which charged Petitioner with conspiring to possess with intent to distribute more than 100 kilograms of marijuana. CR 100-069, doc. nos. 51, 81. Petitioner argued on direct appeal that the evidence was insufficient to support the jury's verdict; the Eleventh Circuit affirmed her conviction. United States v. Godbee, No. 02-12341 (11th Cir. June 4, 2003). Accordingly, this Court rejects Petitioner's attempt to reargue the issue.[6]

---

[6]The Court is aware of Petitioner's reliance upon a typographical error in the Eleventh Circuit's unpublished opinion affirming her conviction. (See doc. no. 4, p. 5). The Eleventh Circuit mistakenly stated that Petitioner was convicted of conspiracy to possess with intent to distribute "less than 50 kilograms of marijuana." United States v. Godbee, No. 02-12341, slip op. at 1 (11th Cir. June 4, 2003). Nevertheless, as explained *supra*, the jury actually convicted her of

14

e.   **Appellate Representation**

Finally, the Court dispenses with Petitioner's assertion that her counsel was ineffective on appeal. As Petitioner correctly notes, her retained trial counsel attempted to withdraw from appellate representation, alleging that he had only been retained for Petitioner's trial. (Doc. no. 1, pp. 8-10). Petitioner filed a *pro se* notice of appeal. CR 100-069, doc. no. 94 (S.D. Ga. Apr. 26, 2002). The Eleventh Circuit then denied Petitioner's counsel leave to withdraw. United States v. Godbee, No. 02-12341 (11th Cir. Nov. 27, 2002). As noted, counsel then pursued a challenge to Petitioner's conviction as lacking proper evidentiary support.

Petitioner argues that counsel should have raised on appeal each of the substantive claims already discussed. However, as demonstrated herein, none of those claims have merit. Although Strickland applies to appellate representation, see Murray, 477 U.S. at 488, the Sixth Amendment does not require counsel to bring every conceivable issue on appeal. See Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Rather, effective appellate advocates "winnow out" weaker arguments, even though some of these arguments may have arguable merit. Id. Furthermore, counsel is never ineffective for failing to raise frivolous claims on appeal. Nyhuis, 211 F.3d at 1344. Here, Petitioner has presented no claim which, if raised on appeal, could have had a significant impact on the outcome of her case. See id. Of course, none of this is to say that the Court condones counsel's hesitancy to represent Petitioner on appeal. That said, counsel's reluctance in continuing to represent Petitioner

---

conspiring to possess with intent to distribute more than 100 kilograms of marijuana. Accordingly, Petitioner's reliance upon a typo is unavailing.

presents no occasion for § 2255 relief because Petitioner has not shown that counsel's performance caused her to suffer any prejudice.  As a result, Petitioner's claims regarding her appellate representation lack merit.

In sum, Petitioner's § 2255 motion should be denied.

### III.  CONCLUSION

For the above reasons, the Court **REPORTS** and **RECOMMENDS** that Petitioner's § 2255 motion be **DENIED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of the Government.

SO REPORTED AND RECOMMENDED this 22nd day of February, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

16